|  |  |
|---|---|
| KEITH SEVICK,<br><br>    Plaintiff,<br><br>       v.<br><br>LIFE TIME INC. and LFT<br>CONSTRUCTION COMPANY, LLC,<br><br>    Defendants / Third Party Plaintiffs,<br><br>       v.<br><br>AGL SPRAY FOAM, LLC,<br><br>    Third Party Defendant. | Civil Action No. 21-2122 (RK) (JTQ)<br><br>**OPINION** |

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court upon the Motion for Summary Judgment filed by Defendants Life Time, Inc. and LFT Construction Company, LLC (together, "Life Time" or "Defendants"). (ECF No. 41.) Plaintiff Keith Sevick ("Plaintiff") filed an opposition to the Motion, (ECF No. 42), and Defendants filed a reply, (ECF No. 43). The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED**.

## I.    BACKGROUND

    This matter arises from an injury Plaintiff suffered while installing fireproofing paint at a commercial jobsite in Bridgewater, New Jersey on February 19, 2019. Defendant LFT

Construction Company, LLC ("Life Time") was the general contractor for the jobsite,[1] and non-party AGL Foam Spray, LLC ("AGL") was a subcontractor that employed Plaintiff. An AGL employee applied the paint from a pressurized hose attached to a spray machine, which in turn was energized by a heating unit that also kept the paint warm until it could be applied. At some point during the work, the hose developed a hole, from which paint sprayed at high pressure. One of Life Time's employees noticed the tear and drew Plaintiff's attention to it. Plaintiff, who had been assisting the other AGL employee apply the paint, grabbed the hose with his left hand, resulting in serious injuries, including the eventual amputation of three fingers. Plaintiff filed a negligence suit against Defendants on February 8, 2021. (ECF No. 1.)

After the close of discovery, Defendants filed their pending Motion for Summary Judgment, (ECF No. 41), supported by a brief, ("Defs.' Br.", ECF No. 41-2), a Statement of Facts, ("Defs.' SOF", ECF No. 41-3), and the certification of counsel with accompanying exhibits, (Decl. of Joseph G. Fuoco ("Fuoco Decl."), ECF No. 41-4). Plaintiff opposed the Motion, filing a brief, ("Pl.'s Br.", ECF No. 42), a Counter-Statement of Facts, ("Pl.'s C-SOF", ECF No. 42-1), and a separate Statement of Facts, ("Pl.'s SOF", ECF No. 42-2). Plaintiff did not submit any additional exhibits with its opposition. Defendants filed a reply brief, ("Defs.' Reply Br.", ECF No. 43), and a Counter-Statement of Facts ("Defs.' C-SOF", ECF No. 43-1).

The thrust of Defendants' summary judgment arguments is that Life Time, as the general contractor for the jobsite, owed no duty to Plaintiff, who was employed by the subcontractor AGL and who was injured by a known hazard incidental to the very work—applying fireproofing

---

[1] The parties' submissions do not clarify the exact relationship between the two Defendants, Life Time, Inc. and LFT Construction Company, LLC. The Complaint treats them interchangeably, (ECF No. 1 ¶ 7), and Defendants' briefing refers to the two entities collectively as "Life Time," (ECF No. 41-2 at 1). Because the parties do not differentiate between Defendants, the Court also refers to them together as "Life Time."

paint—that the subcontractor was hired to perform. (Defs.' Br. at 4–13.) Plaintiff disagrees and argues that multiple bases exist to find that Defendants' owed Plaintiff a duty. (Pl.'s Br. at 4–23.)

## A. AGL'S AND PLAINTIFF'S ROLES AT THE BRIDGEWATER JOBSITE

AGL is a contractor that installs spray foam insulation at residential and commercial properties. (Dep. Tr. of John Cunningham ("Cunningham Dep."), Ex. E to Fuoco Decl., ECF No. 41-4 at 7:12–15.) Spray foam is "polyurethane foam that's used to insulate houses, reduce thermal heat transfer through walls and roof lines." (*Id.* at 7:16–19.) Life Time hired AGL to install spray foam on the walls and ceilings of certain rooms at Life Time's jobsite in Bridgewater, New Jersey (the "Bridgewater Jobsite"). (*Id.* at 12:5–9; *see also* Life Time Construction Standard Construction Subcontract between Life Time and AGL ("Life Time–AGL Contract"), Ex. A to Fuoco Decl., ECF No. 41-4.)

Plaintiff was an AGL employee working with one other AGL employee, Steven Appenzeller ("Appenzeller") at the Bridgewater Jobsite on February 19, 2019, the day of the injury. (Def.'s SOF ¶¶ 3–4.) Plaintiff's job responsibilities included "[p]repping, clean up, basically scraping any over spray, fireproofing over insulation if needed, proper ventilation if needed." (Dep. Tr. of Keith Sevick ("Sevick Dep."), Ex. B. to Fuoco Decl., ECF No. 41-4 at 20:12–19.) Appenzeller was working as the "sprayer" and Plaintiff was his "assistant," responsible for "help[ing to] get the hose into the proper area for spraying and generally assist[] the sprayer throughout the day as needed and help clean up." (Dep. Tr. of Michael Ewing ("Ewing Dep."), Ex. C to Fuoco Decl., ECF No. 41-4 at 20:15–24; *see also* Def.'s SOF ¶ 6 (Appenzeller was Plaintiff's "superior").) Plaintiff received his job assignment that day from his warehouse manager, an AGL employee. (*Id.* ¶ 8.)

AGL's witnesses, including Plaintiff, uniformly testified that they were experienced at their jobs and did not receive instruction from Life Time employees for their work at the Bridgewater Jobsite. (*Id.* ¶¶ 10–12, 22.) Cunningham and Ewing—AGL's owner and its operations manager, (Cunningham Dep. at 7:2–11; Ewing Dep. at 9:11–15)—estimated that AGL performed similar jobs 20–40 times per year, totaling hundreds of prior similar jobs. (Def.'s SOF ¶¶ 23–24.) There were no safety issues with AGL at the jobsite prior to Plaintiff's injury. (*Id.* ¶ 25.) Plaintiff had assisted with spraying fireproofing paint on numerous other occasions without incident. (*Id.* ¶ 28.) Appenzeller testified that he had done so approximately 100 times before without problem. (*Id.* ¶ 29.) Plaintiff testified that no one, including anyone from Life Time, instructed him on how to do his job the day of the injury and that he knew how to do his job without instruction. (Sevick Dep. at 25:13–26:2.) Likewise, Appenzeller testified that he did not get his assignment from anyone at the jobsite because the AGL employees "knew the job at hand and went to the site and completed our task." (Dep. Tr. of Steven Appenzeller ("Appenzeller Dep."), Ex. D to Fuoco Decl., ECF No. 41-4 at 30:6–20.) Neither Appenzeller nor Plaintiff interacted with any of Life Time's employees prior to Plaintiff's injury. (*Id.* at 34:7–20; Sevick Dep. at 26:7–25.)

Part of AGL's work at the Bridgewater Jobsite required applying fireproofing paint on top of insulation foam using a spray machine. Paint would flow from a bucket into the spray machine, through a filter, into a pressurized hose, and then out of a nozzle in a fan pattern when the user pulled a trigger. (Appenzeller Dep. at 45:7–22.) Before being sprayed, the paint was kept in a bucket near a heating unit to keep the paint at the correct temperature and prevent it from freezing. (Def.'s SOF ¶ 17.) Both the spray machine and the heating unit were powered by electricity, *i.e.* they had an attachment plug that needed to be inserted into an electrical outlet to be used. (Appenzeller Dep. at 31:4–7, 32:17–20.)

Plaintiff and Appenzeller, the only AGL employees on site that day, testified that there were issues energizing the spray machine using the outlets available at the Bridgewater Jobsite. Plaintiff testified that the electrical outlets at the jobsite were "not sufficient" for the work AGL was hired to do. (Sevick Dep. at 27:9–15; *id.* at 78:14–79:11.) Appenzeller likewise testified that "[b]reakers were constantly tripping" when he tried, several times, to plug the spray machine directly into different outlets at the Bridgewater Jobsite. (Appenzeller Dep. at 37:7–38:9; *id.* at 40:2–3, 41:25–42:2.) The Life Time–AGL Contract required AGL to supply their own equipment, including "temporary power and heat (to the extent not provided by [Life Time]) . . . for the completion of the work set forth in this Subcontract." (Life Time–AGL Contract at 1.) AGL's employees testified that if they needed equipment for their work that they did not have, they were instructed to call the AGL office to request the equipment and that they were also authorized to purchase needed equipment themselves. (Def.'s SOF ¶ 21.) Appenzeller spoke with someone at the AGL office, but never any Life Time employee, about the issue. (Appenzeller Dep. at 38:2–39:7, 39:22–40:3; Sevick Dep. at 27:16–29:22.)

Eventually, Appenzeller plugged the spray machine into a heating unit and in turn plugged the heating unit into an outlet at the Bridgewater Jobsite. (Def.'s SOF ¶¶ 20, 30.) Appenzeller explained that by plugging the spray machine into a heating unit rather than directly into an outlet at the Bridgewater Jobsite, he was able to "bypass" the circuit breaker in the outlets. (Appenzeller Dep. at 40:4–22; *id.* at 43:7–16.) Plaintiff and Appenzeller both testified that no Life Time employees observed Appenzeller plug the spray machine into a heating unit or instructed him to do so. (Def.'s SOF ¶ 34; Appenzeller Dep. at 43:24–44:8; Sevick Dep. at 30:18–31:3.) Appenzeller believed there was nothing unsafe about this arrangement, although he had never done so before. (Def.'s SOF ¶ 32; Appenzeller Dep. at 40:15–18, 41:7–9.) Life Time's employees—who were not

present at the time—subsequently testified that doing so was dangerous because it can cause too much voltage on the unit and result in the unit tripping. (Pl.'s SOF ¶¶ 42–43.)

The parties agree that the spray machine belonged to AGL, (Def.'s SOF ¶ 14), but disagree whether the heating unit that Appenzeller plugged the spray machine into belonged to AGL or Defendant. Appenzeller testified that AGL supplied the equipment Appenzeller used that day, including the heating unit that he plugged the spray machine into. (Appenzeller Dep. at 30:21–31:12; *id.* at 69:21–70:8; *id.* at 72:3–9; *id.* at 78:4–9.) Appenzeller testified that he remembered using AGL's heating unit, rather than the propane-powered "bullet heaters" Life Time had at the Bridgewater Jobsite, because the Life Time bullet heaters were "a lot larger" than AGL's and were provided "to keep . . . the job site acclimated." (*Id.* at 78:10–16.) Appenzeller testified that he could not have hooked the spray machine to Life Time's bullet heaters because they lacked an outlet he could plug into. (*Id.* at 79:17–25.) Wilhelm Haeger ("Haeger"), the Life Time employee present when Plaintiff was injured, also testified that there were heating units at the Bridgewater Jobsite provided by subcontractors, *i.e.* not by Life Time. (Dep. Tr. of Wilhelm Haeger ("Haeger Dep."), Ex. J to Fuoco Decl., ECF No. 41-4 at 97:6–12.) However, Haeger also testified that he believed the heating unit involved in Plaintiff's injury was one that Haeger had purchased for Life Time. (Pl.'s SOF ¶ 13.)[2]

## B.    PLAINTIFF'S INJURY

At the time of the injury, Appenzeller was spraying fireproofing paint while Plaintiff was in the adjacent room. (Def.'s SOF ¶ 7; Pl.'s C-SOF ¶ 7.) Appenzeller was able to operate the spray

---

[2] A number of other witnesses could not testify either way whether the heating unit involved in Plaintiff's injury was provided by AGL or Life Time. Plaintiff recalled seeing multiple heating units warming the rooms at the Bridgewater Jobsite but was not sure who supplied the heating unit that AGL's spray machine plugged into. (Sevick Dep. at 46:2–15.) Two of Life Time's employees—John Howard, the construction superintendent for the project, and Derek Delahanty, the assistant superintendent—testified generally that

machine for several hours without issue. (Def.'s SOF ¶¶ 35–38; Appenzeller Dep. at 44:9–12 ("approximately two hours"); Sevick Dep. at 80:14–17 ("approximately a few hours").) Shortly before Plaintiff's injury, Haeger, a field engineer for Life Time, performed a walk-through of the Bridgewater Jobsite when he first observed paint spraying from a hose attached to the spray machine. (Def.'s SOF ¶¶ 47, 49–50.) Haeger testified that he had never operated a spray machine before, did not know how to turn it off, and that the spray created a hazard for anyone not wearing personal protective equipment. (Haeger Dep. at 57:3–8, 61:13–21.) At the time, Haeger was approximately 30 feet away from the spraying hose, and the only other person in the area was Plaintiff, who was approximately 5 to 10 feet from the machine. (Haeger Dep. at 57:21–58:1, 59:18–60:15.) Haeger recognized the spraying paint as a potential hazard and tried to alert Plaintiff to this potential hazard. (Def.'s SOF ¶¶ 51, 54.)

Plaintiff recalled seeing Haeger directing Plaintiff's attention to the spray machine. (Sevick Dep. at 31:4–16.) Plaintiff testified that Haeger did this by waving at him and pointing at the spray machine. (*Id.* at 31:10–11 ("He just waved for me to get out and pointed at our machine."); *id.* at 31:22–24 ("He just kind of waved his hands in the air from down the hallway to get my attention and came."); *id.* at 32:10–11 ("Just waving kind of both arms in the air."); *id.* at 32:14–18 ("Q. Did he point a finger at the spray installation equipment or at the heater or anything like that? / A. At the heater with the spray insulation equipment.").) At the time, Appenzeller was in the room next to Plaintiff and could not see what Plaintiff was doing with the spray machine. (*Id.* at 60:2–8.)

---

there were heating units at the Bridgewater Jobsite, without testifying who supplied the specific heating unit involved in Plaintiff's injury. (Pl.'s SOF ¶¶ 14–15.)

Plaintiff testified that after Haeger waved at the equipment, Plaintiff looked and saw paint "spraying up towards the ceiling out of the hose." (Def.'s SOF ¶ 57.) Plaintiff testified that the hose was on top of the heater and that he suspected "[a] possible tear [in the hose] from the heater" was causing the paint to spray and that he "wanted to remove [the hose] as quickly as possible before further damage." (Sevick Dep. at 32:21–22.) Plaintiff understood that the heat from the heater may have caused the damage to the hose. (Def.'s SOF ¶¶ 59–60.) Plaintiff understood that it was possible to turn the heating unit off by pressing a button on the unit or removing the cord from the wall outlet. (Sevick Dep. at 35: 14–24.)[3] However, Plaintiff was unable to reach the button because of the spraying paint. (*Id.* at 35:25–36:7.)

Instead, Plaintiff put his left hand on the hose to "pull it away from the heater." (*Id.* at 35:7–13.) Plaintiff did not immediately feel any pain, but seconds later when he tried to let go of the hose, it felt "[l]ike [he was] being electrocuted." (*Id.* at 36:23–37:11.) Plaintiff "kick[ed] the button for the power on the spray machine" and then "ran and informed [Appenzeller] that there was a problem with the machine and it stopped spraying." (*Id.* at 38:20–25.) Plaintiff was taken to the hospital from the jobsite by ambulance. (*Id.* at 39:2–40:6.) Plaintiff underwent nine surgeries on his left hand, ultimately resulting in three fingers of his left hand being surgically amputated. (*Id.* at 41:3–24.)

## C. SAFETY AT THE BRIDGEWATER JOBSITE

The parties presented evidence placing responsibility for workplace safety on Life Time (the general contractor), AGL (the subcontractor), and on individual workers themselves. The Life

---

[3] Appenzeller, who was not present at the time of the incident, agreed with Plaintiff that it would have been possible to turn off the spray machine by pressing a button or unplugging it from the electrical outlet on the heating unit. (Appenzeller Dep. at 51:21–52:10.)

Time–AGL Contract incorporated Life Time's "General Conditions" as Exhibit A and its "Safety

Requirements" as Exhibit B. The Safety Requirements delineate responsibility for jobsite safety:

> Subcontractor shall be solely responsible for protection and safety
> of its employees, agents, subcontractors and suppliers, for final
> selection of safety methods and means, for required safety reports
> and records, for daily inspection of its work area and its employees'
> safety equipment, and for instruction of its employees on health and
> safety, including weekly safety meetings.

(Ex. B to Life Time–AGL Contract § 1.1.) However, Life Time's witnesses testified that, as the

general contractor, Life Time was generally responsible for overall safety at the Bridgewater

Jobsite and should not allow an unsafe condition to exist if they noticed it. (Pl.'s SOF ¶¶33–41.)

The parties also do not contest that Life Time's employees had the authority to correct an unsafe

condition they noticed. The General Conditions of the Life Time–AGL Contract state that if the

subcontractor is given a "Safety Correction Notice" by Life Time, the subcontractor must take

corrective measures, the failure of which could result in Life Time terminating the contract. (Ex.

A to Life Time–AGL Contract § 1.4.)

Life Time's employees were present at the Bridgewater Jobsite. John Howard, Life Time's

construction superintendent, testified that Life Time employees performed daily walk-throughs of

the site, which David Stramel, a Life Time safety manager, testified was "to identify any situations

that could possibly cause an accident." (Def.'s SOF ¶¶ 45–46.) Haeger, the field engineer, testified

that he would walk the jobsite eight to twelve times per day, although he would not necessarily

visit each portion of the jobsite. (*Id.* ¶ 48; Pl.'s C-SOF ¶ 48.) Plaintiff recalled seeing two Life

Time employees at the jobsite on the day of the injury, but did not interact with them. (Sevick Dep.

at 26:7–25.)

### D.   PLAINTIFF'S JOBSITE SAFETY EXPERT

The parties provided the September 6, 2022 report of Plaintiff's expert Thomas McAdams ("McAdams"), ("McAdams Report", Ex. K to Fuoco Decl., ECF No. 41-4), as well as the transcript of McAdams's deposition, (Dep. Tr. of Thomas McAdams ("McAdams Dep."), Ex. F to Fuoco Decl., ECF No. 41-4). Per his report, McAdams was hired to review "the incident circumstances" of Plaintiff's injury "to determine the nature and cause of this incident." (McAdams Report at 1.)

McAdams formed an opinion regarding Defendant's safety on the jobsite. "The Life Time jobsite personnel, as representatives for the General Contractor, were responsible for the overall safety of the project." (McAdams Report at 28.) McAdams opined that this included "identifying hazards and taking corrective action." (*Id.*) McAdams found that Defendant "was aware that temporary heaters were being utilized in areas of the building where work was being performed" and that through its control of the jobsite, Defendant "knew that workers were or would be working around temporary heaters on the second floor." (*Id.*) McAdams concluded that "[h]ad Life Time better planned to ensure how employees including Keith Sevick, were going to work in a safe manner and eliminate risk, this incident could have been avoided." (*Id.*)

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that the Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "view[] the facts in the light most favorable to the party against whom summary judgment was entered." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). A "material fact" is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute"

about a fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment has the initial burden of establishing its right to summary judgment. *See Celotex Corp.*, 477 U.S. at 323. To show that a material fact is not genuinely disputed, it "must . . . cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The moving party may also meet its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the movant meets this threshold burden under Rule 56, the non-moving party must present evidence to establish a genuine issue as to a material fact. *See Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding that the non-movant "must do more than simply show that there is some metaphysical doubt as to material facts"). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino*, 358 F.3d at 247 (quoting *Anderson*, 477 U.S. at 255).

## III.   **DISCUSSION**

Plaintiff's sole claim against Life Time is based on a negligence theory of liability. Therefore, to make out his case, Plaintiff must prove (1) duty of care, (2) breach of that duty, (3) proximate cause, and (4) damages. *See Brown v. Racquet Club of Bricktown*, 471 A.2d 25, 29

(N.J. 1984). The failure to adduce evidence supporting any one of these elements requires granting summary judgment for Life Time. *See Celotex*, 477 U.S. at 322.

The parties' arguments on summary judgment focus primarily on whether Life Time owed Plaintiff a duty and, if so, whether sufficient evidence exists for a jury to find that Life Time breached that duty. "The question of whether a duty exists is a matter of law to be decided by the court." *City Check Cashing, Inc. v. Manufacturers Hanover Tr. Co.*, 764 A.2d 411, 416 (N.J. 2001); *see also V.C. by Costello v. Target Corp.*, 454 F. Supp. 3d 415, 423 (D.N.J. 2020) (same) (citing *Strachan v. John F. Kennedy Memorial Hosp.*, 538 A.2d 346, 349 (N.J. 1988)). The parties discuss three doctrines through which a general contractor could be liable for the injury to a subcontractor's employee. The Court addresses each in turn and finds that none provides a basis to impose a duty on Life Time such that Life Time reasonably could have been expected to prevent Plaintiff's injury.

### A.    COMMON LAW PRINCIPLES

In seeking summary judgment, Life Time relies on the traditional, common law principle limiting a contractor's liability for a jobsite injury to a subcontractor's employee. (Def.'s Br. at 5–7.) "At common law, a general contractor enjoyed broad immunity from liability for injuries to an employee of a subcontractor resulting from either the condition of the premises or the manner in which the hired work was performed." *Tarabokia v. Structure Tone*, 57 A.3d 25, 31–32 (N.J. Super. Ct. App. Div. 2012) (citing *Muhammad v. New Jersey Transit*, 821 A.2d 1148, 1156 (N.J. 2003) and *Wolczak v. Nat'l Elec. Prod. Corp.*, 168 A.2d 412, 415 (N.J. Super. Ct. App. Div. 1961)). As the New Jersey Supreme Court explained in *Muhammad*:

> The [general contractor] may assume that the worker, or his superiors, are possessed of sufficient skill to recognize the degree of danger involved and to adjust their methods of work accordingly. Thus the unimpaired line of holdings to the effect that the duty to

provide a reasonably safe working place for employees of an independent contractor does not relate to known hazards which are part of or incidental to the very work the contractor was hired to perform.

821 A.2d at 1156 (quoting *Wolczak*, 168 A.2d at 417 (collecting cases)). This principle applies regardless of whether the party contracting out the work is "a landowner or a general contractor." *Id.* (discussing *Wolczak*, 168 A.2d at 415).

Three exceptions to this general common law rule are recognized, *id.* at 1155 (citation omitted), which Life Time argues do not apply here, (Def.'s Br. at 8–12). General contractor non-liability does not apply: "(a) where the [general contractor] retains control of the manner and means of the doing of the work which is the subject of the contract; (b) where he engages an incompetent contractor, or (c) where . . . the activity contracted for constitutes a nuisance *per se*." *Muhammad*, 821 A.2d at 1155 (quoting *Majestic Realty Assocs., Inc. v. Toti Contracting Co.*, 153 A.2d 321, 324 (N.J. 1959)). Regarding the first exception, "[d]eveloping a project and directing that it be completed within a certain timeframe and within certain specifications do[es] not constitute interference with the project" such that the general contractor retains control of how the contract's work is carried out. *Id.* (citing *Mavrikidis v. Petullo*, 707 A.2d 977, 986 (N.J. 1998)).

In response, Plaintiff contends that the principles the New Jersey Supreme Court articulated in *Muhammad* are "outdated" because they rely on cases "decided during the time period from 1903 to 1961." (Pl.'s Br. at 8–9.) However, the fact that *Muhammad*, a 2003 decision, cites decades-old cases does not undermine the continuing vitality of the common law doctrine *Muhammad* articulated; indeed, the New Jersey Supreme Court case Plaintiff primarily relies on, treated in depth below, was decided before *Muhammad*. (*Id.* at 4–5, 7–9, 11, 14–18, 24 (discussing *Alloway v. Bradlees, Inc.*, 723 A.2d 960 (N.J. 1999)).) Further, Plaintiff argues that *Muhammad* is factually distinguishable because the defendant there was a public entity landowner only subject

to liability under the New Jersey Tort Claims Act, N.J. Stat. Ann. §59:1–1 *et seq.* ("NJTCA"), rather than a private general contractor. (Pl.'s Br. at 9.) However, while the "palpably unreasonable" standard applied under the NJTCA differs from the duty of care applicable to traditional negligence claims, *Muhammad*, 821 A.2d at 1154 (citation omitted), *Muhammad*'s articulation of the principles governing a general contractor's duty to an independent contractor applies regardless of the identity of the general contractor. *See Tarabokia*, 57 A.3d at 31–32 (applying *Muhammad* in a case involving a private entity general contractor).

Plaintiff makes a one-paragraph argument that even if this common law principle applies, the Court should find that Life Time owed Plaintiff a duty. "The hose of a paint sprayer being damaged by a portable electric heater is not a known hazard which is part of or incidental to the very work Plaintiff was hired to perform." (Pl.'s Br. at 20.) Plaintiff points to Appenzeller's testimony that he had never energized the spray machine by plugging it into a heating unit before and testimony from Life Time's employees that doing so was dangerous. (Pl.'s Br. at 20 (citing Appenzeller Dep. at 40:15–18, 41:7–9; Pl.'s SOF ¶¶ 42–43).) Defendant responds that Appenzeller connected the spray machine to the heating unit without Life Time's instruction or knowledge, that "it was AGL's practice to use such heaters during winter months to keep its paint warm," and that Plaintiff was aware of the tear in the hose before he decided to grab it. (Def.'s Reply Br. at 4.) Based on this, Life Time argues that the hazard was incidental to AGL's work, that the hazard was known to Plaintiff at the time of the injury, and that the hazard would have existed regardless of whether the paint sprayer was energized by the heater. (*Id.*)

The Court agrees with Life Time that Plaintiff has not adduced evidence that supports imposing a duty on Life Time under the common law rule. The hazardous condition here—a leak in the hose on AGL's equipment—was "part of or incidental to the very work [AGL] was hired to

perform." *Muhammad*, 821 A.2d at 1156 (quoting *Wolczak*, 168 A.2d at 417). Life Time hired AGL to apply spray foam insulation to certain rooms of the Bridgewater Jobsite. (Cunningham Dep. at 12:5–9.) At the time of the injury, Plaintiff was assisting in "spraying a fireproofing paint on top of the insulation foam" at the site. (Sevick Dep. at 20:12–23.) Plaintiff and Appenzeller— the AGL employees at the jobsite that day, (Appenzeller Dep. at 33:8–18)—agreed that using the heating unit was integral to the work AGL was hired to perform because the heating unit kept the paint from freezing. (*See id.* at 30:13–17; Sevick Dep. at 23:3–17.) Therefore, operating the spray machine in proximity to the heating unit was part and parcel of AGL's normal work spraying fireproofing paint in cold weather. The danger that arose from the hose being near the heating unit, and potentially springing a leak because of that proximity, was incidental to the very work AGL was hired to perform.

Plaintiff attempts to sidestep this principle by defining the hazard granularly, contending that the relevant hazard arose because Appenzeller had never energized the sprayer that way before, and thus, the hazard was not "incidental to" AGL's work. (Pl.'s Br. at 20.) However, through this argument, Plaintiff does not challenge that his injury resulted from "the manner in which the hired work was performed." *Tarabokia v. Structure Tone*, 57 A.3d 25, 31–32 (N.J. Super. Ct. App. Div. 2012). Here, AGL's employees—Appenzeller, with Plaintiff's knowledge— were the ones who decided to plug the spray machine into the heating unit without Life Time's instruction, knowledge, or approval. (Def.'s SOF ¶ 34; Appenzeller Dep. at 30:6–20, 43:24–44:8; Sevick Dep. at 25:13–26:2, 30:18–31:3.) Plaintiff offers no authority or explanation for his position that a subcontractor's choice to carry out its task in an abnormally hazardous way—as Plaintiff contends Appenzeller did by energizing the spray by the heating unit—shifts the common law duty to safely perform the work they were hired to do from the subcontractor to the general

contractor. Here, the hazard of a leak forming in the hose arose from AGL's job to spray paint at the jobsite in cold weather.[4]

## B.    MODERN NEGLIGENCE PRINCIPLES

Having concluded that no duty can be imposed on Life Time under traditional common law principles of general contractor liability alone, the Court turns to the modern negligence principles on which Plaintiff primarily relies. The fact that a duty on a subcontractor does not lie under the common law known hazard rule "does not end [the court's] inquiry" at summary judgment. *Tarabokia*, 57 A.3d at 32. "The more modern approach to the traditional common law rule," as applied in *Alloway v. Bradlees, Inc.*, 723 A.2d 960 (N.J. 1999), "is for courts to identify, weigh and balance a combination of factors in determining the existence of a general contractor's duty of reasonable care . . . ." *Id.* (citing *Alloway*, 723 A.2d at 964–65).

In *Alloway*, the New Jersey Supreme Court considered whether a general contractor owed the employee of a subcontractor a duty to assure the employee's safety. 723 A.2d at 964. The Court considered whether the general contractor owed a duty of reasonable care under "general negligence principles" by examining and weighing the foreseeability of the risk of injury," *id.* (citing *Carey v. Lovett*, 622 A.2d 1279, 1286 (N.J. 1993)), as well as "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution," *id.* (quoting *Hopkins v. Fox & Lazo Realtors*, 625 A.2d 1110, 1116 (N.J. 1993)). The Court cautioned that the analysis must be "'both fact-specific and

---

[4] While Defendant dedicates a significant portion of its opening brief to arguing that none of the three exceptions to the common law rule apply, (Def.'s Br. at 8–12), Plaintiff does not address them except to argue that the exceptions' non-applicability does not end the Court's inquiry, (Pl.'s Br. at 7–8). Because Plaintiff does not argue that any exception applies, the Court need not address them. *See Dreibelbis v. Scholton*, 274 F. App'x 183, 185 (3d Cir. 2008) (affirming district court's grant of a motion to dismiss on grounds raised in defendants' motion but not addressed in plaintiff's opposition despite "ample opportunity" to contest it (citations omitted)).

principled,' and must satisfy 'an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy.'" *Id.* at 964–65 (quoting *Hopkins*, 625 A.2d at 1116). On defendant's motion for summary judgment, the court determines the existence of a duty by "consider[ing] and weigh[ing] the facts most favorably in support of [the] plaintiff's contentions." *Id.* at 965 (citation omitted).

In *Alloway*, a general contractor, Pat Pavers, was hired to construct a loading ramp at a shopping center, and subcontracted with Bernhard Excavating to deliver paving materials to the jobsite. *Id.* at 962–63. On the day before her injury, the plaintiff, who worked for Bernhard Excavating as a dump truck driver, notified the subcontractor's owner Fred Bernhard ("Bernhard")—who was simultaneously employed by Pat Pavers—that a hydraulic pump necessary to operate the truck's unloading mechanism had become detached from the truck's undercarriage. *Id.* at 963. Bernhard called Pat Pavers to discuss the problem and asked Pat Pavers to repair the truck. *Id.* The plaintiff drove the truck to Pat Pavers's garage, where two of Pat Pavers's employees welded the pump back into place. *Id.* A Pat Pavers employee tested the unloading mechanism with the plaintiff present but was only able to activate it by manually triggering a lever under the truck using a piece of steel. *Id.* One of Pat Pavers's employees informed the plaintiff that the truck required further repair, and later that day, Bernhard informed the plaintiff that the repair would be carried out before the next day; however, it never was. *Id.*

The following day, the plaintiff was delivering stone to the shopping center jobsite in her truck when she again could not get the dump truck's unloading mechanism to function. *Id.* The plaintiff attempted to manually trigger the release mechanism, as she had seen the Pat Pavers employee do the day before, at which point the "power take-off drive shaft engaged," catching the plaintiff's hair and right hand and causing serious injuries. *Id.* The plaintiff sued Pat Pavers, the

district court granted summary judgment for Pat Pavers, and the Appellate Division affirmed. *Id.* at 963–64.

The New Jersey Supreme Court reversed, finding that the general contractor, Pat Pavers, owed the plaintiff a duty to assure her safety using the dump truck. The Court found that the risk of injury was "clearly foreseeable" to Pat Pavers because the day before the accident, "three Pat Pavers employees, including two supervisors, knew that the truck was defective, and had attempted to correct the defect." *Id.* at 965. One of the Pat Pavers employees had manually engaged a mechanism under the truck, which was the maneuver the plaintiff was mimicking when the accident occurred. *Id.* Further, the Court found a "substantial and close relationship between the parties" based on Bernard being both the principal of the subcontractor and a superintendent of the general contractor. *Id.* at 966. Finally, based on the contractual relationship between Pat Pavers and Bernard Excavating and Pat Pavers's actual history with the dump truck, the general contractor had the "opportunity and capacity . . . to exercise authority and control over the equipment of Bernhard Excavating if safety concerns were implicated." *Id.*

Plaintiff relies primarily on *Alloway* in seeking the Court to impose a duty on Life Time. Plaintiff cites testimony from Life Time's employees agreeing that safety was important and that a general contractor shares responsible for general safety at a jobsite. (Pl.'s Br. at 12–14.) Plaintiff argues that the danger was foreseeable because Life Time should have been aware of the electrical issues at the Bridgewater Jobsite and provided the heating unit involved in the injury. (*Id.* at 14.) Plaintiff contends that Life Time's employees agreed that using a heating unit to power other equipment was dangerous and that Life Time's own safety policies "spoke on the safe use of temporary heaters which included barricades." (*Id.*) Plaintiff continues that Life Time did not enforce its safety program, provide Plaintiff with safety training, or "perform frequent inspections"

of the jobsite where the injury occurred. (*Id.* at 14–15.) Next, Plaintiff argues that Life Time's and AGL's contractual relationship afforded Life Time "both the opportunity and the capacity . . . to exercise authority and control over the equipment of AGL/Plaintiff if safety concerns were implicated." (*Id.* at 16.) Plaintiff raises two potential hazards—plugging the spray machine into the heating unit and the close proximity of the pressurized hose to the heating unit—that Life Time's employees should have spotted and corrected. (*Id.* at 18–19.) Finally, Plaintiff contends, based on the opinion of its safety expert, that Life Time's conduct violated standards set by the Occupational Safety and Health Administration ("OSHA") and that this supports imposition of a duty on Life Time. (*Id.* at 5–6, 9–11, 17.)

In response, Life Time distinguishes *Alloway*, arguing that the relationship between the general contractor and the subcontractor's employee in *Alloway* is significantly different from Life Time's and Plaintiff's relationship here. (Def.'s Reply Br. at 7–8.) Life Time argues that the injury was not foreseeable because Haeger only identified the hazard "moments before the accident" and there was no evidence that Life Time knew how Plaintiff and Appenzeller were using the spray machine and heating unit. (*Id.* at 8, 10.) Life Time further argues that there was no overlap of employees between Life Time and AGL, as in *Alloway*, that blurred the responsibilities between general contractor and subcontractor. (*Id.* at 9.) Life Time contends that it had no control over the equipment the subcontractor used or how Plaintiff carried out his work, and that the contract between Life Time and AGL required AGL to be responsible for the safety of its own employees. (*Id.* at 11.)

The Court considers each of the factors discussed in *Alloway*, beginning with the "foreseeability of the risk of injury," which *Alloway* called the "major consideration" in determining the existence of a duty. *Alloway*, 723 A.2d at 964. "Foreseeability is generally

measured by the general contractor's actual knowledge of dangerous conditions." *Tarabokia*, 57 A.3d at 32 (citing *Alloway*, 723 A.2d at 965). "Foreseeability does not depend on whether the exact incident or occurrences were foreseeable. The question is whether an incident of that general nature was reasonably foreseeable." *McGovern v. City of Jersey City*, No. 98-5186, 2006 WL 42236, at *17 (D.N.J. Jan. 6, 2006) (quoting *Cassanello v. Luddy*, 695 A.2d 325, 329 (N.J. Super. Ct. App. Div. 1997)). However, the fact that an injury may be foreseeable does not, in every instance, result in a duty being imposed. *See Dunphy v. Gregor*, 642 A.2d 372, 376 (N.J. 1994) ("Although a foreseeable risk is the indispensable cornerstone of any formulation of a duty of care, not all foreseeable risks give rise to duties.").

Here, Plaintiff has not offered evidence that the risk of injury was reasonably foreseeable sufficient to support imposing a duty on Life Time. The dangerous conditions Plaintiff identifies are (1) the spray machine being plugged into the heating unit and (2) the spray machine's hose being near the heating unit. (Pl.'s Br. at 18–19.) First, it was not reasonably foreseeable to Life Time that AGL's employees would plug the spray machine into the heating unit. The Life Time–AGL Contract required AGL to supply "temporary power and heat (to the extent not provided by [Life Time])" to complete AGL's work. (Life Time–AGL Contract at 1.) Appenzeller and Plaintiff both testified that they did not inform any Life Time employee about the power issues. (Appenzeller Dep. at 38:2–39:7, 39:22–40:3; Sevick Dep. at 27:16–29:22.) No witness from Life Time testified they knew about the power issues at the Bridgewater Jobsite. No one from Life Time ever told AGL's employees that the heaters could be used to energize AGL's equipment, as they were provided in order to warm the jobsite in the winter. (Sevick Dep. at 46:5–15; Haeger Dep. at 95:24–96:16.) Further, it does not necessarily follow from plugging the spray machine into the heating unit that a hazard would be created when the spray machine's hose was laid on top of

the heating unit; indeed, the risk Life Time's employees identified from this setup was not that the hose would leak but that the unit could overload and be tripped. (Pl.'s SOF ¶¶ 42–43.) Therefore, there is no basis to conclude that it was foreseeable to Life Time that AGL's employees would plug their equipment (the spray machine) into a heating unit at the Bridgewater Jobsite, let alone that doing so would lead to the hose being laid on top of the heating unit and a leak forming.

Likewise, the Court finds no basis to conclude that it was foreseeable to Life Time that the AGL spray machine's hose would be laid near the heating unit, such that it could spring a leak that Plaintiff would attempt to fix by grabbing the leaking hose with his hand. As explicated in *Alloway*, a strong indicator of foreseeability is the general contractor's actual knowledge of a risk of injury. *See also Tarabokia*, 57 A.3d at 32 ("Foreseeability is generally measured by the general contractor's actual knowledge of dangerous conditions." (citing *Alloway*, 723 A.2d at 965)). In *Alloway*, three of the general contractor's employees, including two supervisors, had known the truck was defective and attempted to correct the defect the day before the injury. *Alloway*, 723 A.2d at 965; *see also Carvalho v. Toll Bros. & Devs.*, 675 A.2d 209, 213 (N.J. 1996) (imposing a duty on a general contractor where a subcontractor's employee was injured by a collapsing trench wall in part because the general contractor knew that trenches in other areas of the jobsite had collapsed multiple times several days before the accident). Further, the general contractor's employees *created* the dangerous condition by mis-informing the plaintiff that the issue on the dump truck would be repaired the following day and manually triggering the release mechanism, which maneuver the plaintiff copied the following day when she was injured. *Alloway*, 723 A.2d at 965–66. Subsequent cases have distinguished *Alloway* on these facts.[5] Plaintiff offers no

---

[5] *See, e.g., Bennett v. Cedar Brook Corp.*, No. A-3636-02T5, 2004 WL 1557486, at *2 (N.J. Super. Ct. App. Div. June 11, 2004) (distinguishing *Alloway* where no one apart from plaintiff knew that plaintiff had fashioned a make-shift tool that subsequently injured him); *Budz v. Paragon Restoration Corp.*, No. A-1503-08T1, 2009 WL 3762681, at *3 (N.J. Super. Ct. App. Div. Nov. 10, 2009) (distinguishing *Alloway*

evidence that Life Time's employees knew about the position of the hose next to the heater until Haeger noticed the leak and warned Plaintiff. Unlike in *Alloway*, there is no suggestion that Life Time's employees knew that the hose was on top of the heating unit, let alone that their actions helped put the hose there. (McAdams Dep. at 22:20–23 (agreeing that "it was never determined" who placed the spray machine hose near the heating unit).) Nor is there any suggestion, as in *Carvalho*, that the Life Time–AGL Contract specifically envisioned this type of danger. *Carvalho*, 675 A.2d at 213 (finding the risk of a trench collapsing foreseeable because "[t]he contract itself provided for the specific possibility of unstable trench conditions and prescribed contractual duties addressed to those concerns").

The nature of the risk likewise does not support imposition of a duty. *Alloway* does not explain what is considered with this factor, *see generally Alloway*, 723 A.2d at 964, but Plaintiff contends that the nature of the attendant foreseeable risk here is severe given the nature of Plaintiff's injuries, (Pl.'s Br. at 17). However, in *Alloway* and *Carvalho*, each plaintiff's injury directly arose from the foreseeable risk that the New Jersey Supreme Court identified in imposing a duty. In *Alloway*, the plaintiff's injury (her hand and hair getting caught in the unloading mechanism) directly arose from the issues with the dump truck's unloading mechanism that the general contractor's employees tried and failed to fix the day before. 723 A.2d at 962–63. In *Carvalho*, the plaintiff's injury (being crushed when a trench wall collapsed on him) directly arose from the trench wall lacking support structures. 675 A.2d at 212–13. Here, the risk that a leak would develop in the hose is markedly removed and attenuated from Appenzeller's decision to

---

where general contractor did not know that plaintiff was not using safety restraints while working a roof he fell off of); *Lata v. Loughlin*, No. A-1129-17T1, 2018 WL 6164789, at *2 (N.J. Super. Ct. App. Div. Nov. 26, 2018) (distinguishing *Alloway* where general contractor "was not involved in creating the dangerous condition, and was unaware that plaintiff was not wearing his safety harness").

plug AGL's spray machine into the heating unit than the risk and harm were in either *Alloway* or *Carvalho*.

Next, the Court turns to the relationship between Plaintiff, AGL, and Life Time. *See Alloway*, 723 A.2d at 964. In *Alloway*, the Supreme Court emphasized the "substantial and close relationship" between the subcontractor and contractor, which shared employees. *Id.* at 966. The subcontractor's principal was also a superintendent of the general contractor and "supervised paving crews and had direct knowledge of the requirements of the work" that the general contractor had been hired to perform. *Id.* Courts applying *Alloway* have focused on these facts in holding that *Alloway* does not apply on their facts. *See, e.g., Bennett*, 2004 WL 1557486, at *1; *Budz*, 2009 WL 3762681, at *3; *Lata*, 2018 WL 6164789, at *2.

Here, there is no overlap in employees between the two companies or close relationship between AGL and Life Time. AGL's employees uniformly testified that AGL's employees knew how to perform this work and did so without Life Time's supervision. (Appenzeller Dep. at 30:6–20 (testifying that the AGL employees "knew the job at hand and went to the site and completed our task"); Ewing Dep. at 18:16–21; Cunningham Dep. at 12:10–13:2.) Plaintiff likewise testified that no one from Life Time instructed him how to do his job because he knew how to. (Sevick Dep. at 25:13–22, 25:23–26:2.) Neither Appenzeller nor Plaintiff interacted with any of Life Time's employees prior to Plaintiff's injury. (Appenzeller Dep. at 34:7–20; Sevick Dep. at 26:7–25.) Instead, Life Time trusted AGL, an experienced spray foam insulation installation contractor, to carry out its work unsupervised. This relinquishment of control to an expert subcontractor is very different from the relationship between Pat Pavers and Bernhard Excavating in *Alloway*.

However, the Court finds that Plaintiff has a stronger argument regarding Life Time's "opportunity and ability to exercise care." *Alloway*, 723 A.2d at 964 (quoting *Hopkins*, 625 A.2d

at 1116). Plaintiff argues that the Life Time–AGL Contract gave Life Time "both the opportunity and the capacity . . . to exercise authority and control over the equipment of AGL/Plaintiff if safety concerns were implicated." (Pl.'s Br. at 16.) Indeed, numerous of Defendants' witnesses testified that the general contractor shared responsibility for workplace safety and should ameliorate a dangerous condition if they identified it. (Pl.'s SOF ¶¶ 33–41.) Nonetheless, the General Conditions of the contract state that AGL would have to take corrective measures—at a risk of termination of the contract—if Life Time identified an unsafe condition. (Ex. A to Life Time–AGL Contract § 1.4.) Further, Life Time's employees were present at and would routinely walk the Bridgewater Jobsite, (Def.'s SOF ¶¶ 45–46, 48; Pl.'s C-SOF ¶ 48), giving Life Time the opportunity to spot dangerous conditions.

However, the presence of several Life Time employees at the jobsite, even combined with Life Time's employees' testimony that they could have corrected an unsafe condition, cannot support the imposition of a duty. The Life Time–AGL Contract placed on AGL "sole[] responsibility for protection and safety of [AGL's] employees . . . , for final selection of safety methods and means, for required safety reports and records, for daily inspection of its work area and its employees' safety equipment, and for instruction of its employees on health and safety . . . ." (Ex. B to Life Time–AGL Contract § 1.1); *cf. Coronel v. Brigati*, No. A-1776-13T2, 2014 WL 6991681, at *12 (N.J. Super. Ct. App. Div. Dec. 12, 2014) (distinguishing *Alloway* where contractor required the subcontractor "to sign two safety agreements, one of which provided that [the subcontractor] had 'sole responsibility for safety issues connected to the siding job'" (cleaned up)); *Hurless v. Delaware River Port Auth.*, No. A-3778-04T1, 2006 WL 3433839, at *5 (N.J. Super. Ct. App. Div. Nov. 30, 2006) ("[T]here is nothing in the language of the contracts between [the parties] that remotely indicated the [general contractor] assumed responsibility for the safety

of its contractors' employees."). Furthermore, the witnesses' agreement that (1) everyone at a jobsite, including the general contractor, shares responsibility for safety and (2) the general contractor's employees should correct an unsafe condition if they spotted one are unremarkable.

Plaintiff's expert's opinion that Life Time violated OSHA regulations does not change the Court's conclusion. The New Jersey Supreme Court noted that "the applicability of federal safety regulations, specifically OSHA regulations, is highly relevant" to determining the existence of a duty. *Alloway*, 723 A.2d at 966. However, the Court also cautioned that "the violation of OSHA regulations without more does not constitute the basis for an independent or direct tort remedy." *Id.* at 967; *see also Costa v. Gaccione*, 975 A.2d 451 (N.J. Super. Ct. App. Div. 2009) ("[N]on-compliance with [OSHA] standards does not . . . necessarily place a tort duty of care on the general contractor."); *Budz*, 2009 WL 3762681, at *2 (". . . *Alloway* did not impose automatic tort liability on a general contractor for OSHA violations."). "Facts that demonstrate an OSHA violation constitute evidence of negligence that is sufficient to overcome a motion for summary judgment." *Alloway*, 723 A.2d at 970 (citation omitted).

Here, Plaintiff relies on the McAdams Report's opinion that Life Time violated OSHA standards. With respect to OSHA standards, McAdams cites to 29 C.F.R. § 1926.154—which sets out ventilation, clearance, and stability requirements for temporary heating devices in order to prevent fires—and 29 C.F.R. § 1926.203—which defines what constitutes a barricade. (Pl.'s C-SOF ¶¶ 93–94; McAdams Report at 26.) McAdams wrote that "[h]ad Life Time ensured, pursued, and enforced the use of warning devices and/or barricades around heaters, this incident would not have occurred." (McAdams Report at 26.) However, there is no suggestion that Life Time was ever cited for an OSHA violation, (McAdams Dep. at 72:23–74:20), and McAdams does not explain how Life Time violated any OSHA standard. At his deposition, McAdams agreed that the

OSHA standards he cited did not require the use of a warning device or barricade, but nonetheless maintained that Life Time referenced the OSHA standards in its safety manual. (*Id.* at 55:3–19.) Likewise in his brief, Plaintiff argues that McAdams's opinions "are informed by additional provisions of Life Time's safety manual that are consistent with, but do not enlarge, Life Time's duty to maintain a safe workplace under New Jersey law." (Pl.'s Br. at 11.) However, a careful review of the portions of the McAdams Report's section regarding OSHA standards does not make clear how Life Time violated any OSHA standard or any Life Time safety manual that incorporated an OSHA standard. (*See generally* McAdams Report at 26–30.)

Likewise, given that the determination of a duty is a legal question for the Court, Plaintiff's provision of an expert report supporting his argument that Life Time owed him a duty is not dispositive. *See Tarabokia*, 57 A.3d at 30 (affirming grant of summary judgment for defendant despite opinion of plaintiff's "OSHA expert" that the general contractor had a duty to a subcontractor's employee); *Andrews v. Jerud*, No. A-6036-12T3, 2014 WL 4998417, at *6 (N.J. Super. Ct. App. Div. Oct. 8, 2014) ("[T]he expert's report does not change our conclusion that summary judgment was appropriate on plaintiff's claims against defendants" because "whether a defendant owes a legal duty to another and the scope of that duty are generally questions of law for the court to decide." (citation omitted)).

## C.   RESTATEMENT (SECOND) OF TORTS

Finally, Plaintiff separately contends that Life Time owed Plaintiff a duty under the Restatement (Second) of Torts § 323, which addresses the negligent performance of an undertaking. (Pl.'s Br. at 21.) Plaintiff argues that by warning Plaintiff of the danger, Haeger triggered an ongoing duty to Plaintiff. Section 323 states:

> One who undertakes, gratuitously or for consideration, to render
> services to another which he should recognize as necessary for the

protection of the other's person or things, is subject to liability to the
other for physical harm resulting from his failure to exercise
reasonable care to perform his undertaking, if

> (a) his failure to exercise such care increases the risk of such
> harm, or
>
> (b) the harm is suffered because of the other's reliance upon
> the undertaking.

Restatement (Second) of Torts § 323. As Plaintiff points out, (Pl.'s Br. at 21–22), Section 323 has

been adopted by the New Jersey Supreme Court. *See Pfenninger v. Hunterdon Cent. Reg'l High*

*Sch.*, 770 A.2d 1126, 1132 (N.J. 2001) (citing Section 323).[6]

      Plaintiff contends that Life Time's duty arose when Haeger "took it upon himself to alert

Plaintiff to a dangerous hazard" when he "pointed to the hazard and directed Plaintiff toward the

very danger itself." (Pl.'s Br. at 22.) Plaintiff argues that Haeger breached this duty because once

he alerted Plaintiff to the hazard, Haeger "directed Plaintiff toward danger" and "left the area so

as not to put himself in harm's way" but "did not attempt to turn off the heater or the paint sprayer

machine," "reach[] out to the more experienced Life Time superintendent about the situation," or

"verbally directed Plaintiff away from the area." (*Id.* at 24–25.)

      Defendants respond that there is no authority for the proposition that warning a person

constitutes an undertaking to render services that can trigger a duty under Section 323 or 324A.

(Defs.' Reply Br. at 13.) Haeger did not interact with the equipment or tell Plaintiff how to

eliminate the hazard. (*Id.*) Further, Defendants argue that Haeger's actions did not increase the risk

---

[6] Plaintiff also cites Section 324A of the Restatement (Second) of Torts, which contains similar language as Section 323, except that it relates to services rendered to another that are "necessary for the protection of a *third party or his things*." Restatement (Second) of Torts § 324A (emphasis added) ("One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if . . . ."). The Court agrees with Defendants, (Defs.' Reply Br. at 13), that Section 324A is inapposite because Plaintiff does not identify a third party. In any event, if the Restatement provides any basis for liability, it is under Section 323; Plaintiff does not explain how Section 324A could create a duty if Section 323 does not.

of harm to Plaintiff "because Plaintiff knew how to turn the paint sprayer off and was free to correct the hazard." (*Id.*) Defendants also argue that Plaintiff did not rely on Haeger's actions since Haeger merely alerted Plaintiff to the danger but did not give him specific instructions on how to address it. (*Id.* at 13–14.)

The Court finds that Haeger's actions in drawing Plaintiff's attention to the leak do not provide a basis for liability under Section 323. At the outset, it is highly questionable, and the court remains quite dubious, whether Haeger's mere act of pointing out the hazard to Plaintiff constitutes an "undertak[ing] . . . to render services to another which he should recognize as necessary for the protection of the other's person or things." Restatement (Second) of Torts § 323. As Defendants note, (Defs.' Reply Br. at 13), Plaintiff offers no authority for the idea that pointing out a danger to a person triggers a duty to do anything further.

However, the Court need not address this argument of Defendants, because there is no basis in the record to support the claim either that Haeger "fail[ed] to exercise reasonable care" such that his failure "increase[d] the risk of such harm" or that Plaintiff's harm resulted from his "reliance upon the undertaking." Restatement (Second) of Torts § 323. Plaintiff's own testimony is that Haeger merely got Plaintiff's attention and directed it to the spray machine. (Sevick Dep. at 31:10–11 ("[Haeger] just waved for me to get out and pointed at our machine."); *id.* at 31:22–24 ("[Haeger] just kind of waved his hands in the air from down the hallway to get my attention and came."); *id.* at 32:10–11 ("Just waving kind of both arms in the air."); *id.* at 32:14–18 ("Q. Did [Haeger] point a finger at the spray installation equipment or at the heater or anything like that? / A. At the heater with the spray insulation equipment.").) Haeger drawing Plaintiff's attention to the leak in no way *increased* the risk of harm. The dangerous condition—the leak from the hose— existed before Haeger pointed it out to Plaintiff. By making Plaintiff aware of the leak from AGL's

equipment, Haeger, if anything, decreased the possibility of harm by enabling Plaintiff to remedy the harm.

Plaintiff repeatedly characterizes Haeger drawing Plaintiff's attention to the leak as instructing Plaintiff to address the problem. (Pl.'s Br. at 1 ("[Haeger] motioned Plaintiff toward the paint sprayer and the shooting paint."); *id.* at 22 ("Mr. Haeger then pointed to the hazard and directed Plaintiff toward the very danger itself."); *id.* at 24 ("[Haeger] pointed to the hazard and directed Plaintiff toward danger."); *id.* at 25 ("After Mr. Haeger directed Plaintiff toward the high-pressure spraying hose . . .").) However, as noted by the direct citations to Plaintiff's own testimony, there is no inference which could be drawn that by drawing Plaintiff's attention to the hazard, that Haeger either intended to direct Plaintiff to take a specific action or that Plaintiff interpreted the gesture as directing him to take certain action. For similar reasons, there is no evidence that Plaintiff relied on Haeger drawing his attention to the leak for what he did next.[7]

Therefore, Plaintiff cannot establish that Life Time owed Plaintiff a duty based on Haeger's conduct on the day of the injury under the Restatement (Second) of Torts.

---

[7] Plaintiff's laundry list of actions Haeger *could have* taken once he identified the spray issue cannot establish either an increased risk of harm or reliance. Plaintiff argues that Haeger could have told Plaintiff to leave the room to get away from the hazard, remained in the room to observe how Plaintiff handled the hazard, shut off the spray machine himself, or contacted another Life Time employee to ask how to handle the situation. (Pl.'s Br. at 24–25.) Plaintiff offers no support for the position that Haeger's hypothetical ability to prevent Plaintiff's harm triggered a duty under the Restatement to do so.

## **CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED**, and judgment for Defendant on Plaintiff's Complaint will be entered. An appropriate Order will accompany this Opinion.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

<u>Dated</u>: June 28, 2024